The next matter on our calendar is David Bryant v. Justin Thomas, Superintendent of Mercy. Thank you. That was the last guy that ever showed up. Good, we'll take it on submission if he doesn't. I'll ask. May it please the Court, Noah Chamoy for Superintendent Justin Thomas. The District Court erred when it failed to provide any deference to the State Court's determinations of David Bryant's actual innocence and ineffective assistance claims. I'm going to focus on the actual innocence claim, because as for ineffective assistance, there has been no response to the issue of Teague V. Lane prohibiting review of the claim on this appeal, in that Strickland was actually decided four years after this conviction became final. As well, there's been no response to the prejudice analysis in our brief, in which we point out that the lower court failed to actually conduct an ADPA review of prejudice, and the respondent's brief on page 55 again conducts a de novo review. Are you talking the prejudice under Strickland? Under Strickland, yes. If it were to apply under Strickland, the ADPA analysis is simply not there. What is there is a de novo review analysis. And so there's actually nothing there. On that ground alone, this case should be denied on ineffective assistance grounds, on those two grounds. So I'm going to focus on actual innocence instead. So you're saying that he wasn't entitled to an ineffective assistance counsel claim because Strickland didn't exist? Strickland did not exist at the time. There was ineffective assistance counsel. There was, but it was a different standard. In fact, this Court had the farce and mockery standard. New York had the same. Farce and what? Farce and mockery. It's actually a rather... Well, why don't you use English and tell me what it was? It was an amorphous standard that was significantly less than Strickland. Border on incompetence? No, it would be above... Well, incompetence is the standard under Strickland. It would actually be beyond that. Beyond incompetence? Slightly competence. Yes. Not asking for a blood test when there was blood evidence in the case? Does that border on incompetence? No, it does not. In fact, the defense can't cite to a single case where the evidence, the blood evidence, was not necessary to the people's case, meaning that it wasn't inculpatory and an ineffective assistance claim was found based solely on that. It was exculpatory. Well, it wasn't exculpatory, in fact. It was blood evidence. An appreciation of how blood grouping worked would have certainly produced a far more effective cross-examination and understanding of what the medical examiner testified about. Mr. Brine could have been excluded, and that's what the blood evidence could have produced. His blood typing could have produced. But I think Mr. Auerbach said he didn't understand this. It was beyond his can in 1976 when the trial was had to even look at serological evidence. First, the evidence refutes his suggestion that he didn't understand serological evidence. He, in fact, asked questions about serological evidence at the trial and identified another specialist in serology and discussed a prior trial named Noguchi in this trial. So the idea that he did not have serological evidence on his radar is just wrong. It was on his radar. All the more egregious not to have Mr. Brine test it. If he knew enough to talk about it and not to put the evidence in the record, how could that be anything but incompetence? Well, it's not incompetence. The fact of the matter is, let's keep in mind, number one, you're looking at this as a de novo analysis by making these arguments. In reality, ADPA applies. And under ADPA... Just wait a second. You're telling us what we're doing. You better be careful with telling me what I'm doing. Oh, no, I don't mean... Second of all, the trial court said that it had to be to medical certainty or scientific certainty. And if we disagree with what that standard is, that's a law question. We can disagree with that, as Judge Sweet did. And if Judge Sweet was right in disagreeing with that, then Judge Sweet can analyze the fact that there were two sets of experts who disagreed and one said, at best, they were inconclusive. The results were inconclusive. And then could analyze the fact that that expert said it was inconclusive in trying to understand whether the evidence established a claim of actual innocence. So the fact that the state court, in a 440-10 proceeding, a post-conviction and post-appeal proceeding, imposed a clearly convincing standard, might have been appropriate under state law, but does not bind us either as to the ultimate finding of fact, nor does its conclusion that it wasn't met is a legal conclusion that we're not bound by. I understand, and I want to first apologize. Let's be clear about what we're talking about. I want to first apologize, and second, I want to discuss briefly responding to the ineffective assistance aspect of that, which is Auerbach himself. Now, what we have here is a defense attorney who had no recollection of his case. Right. And it's throughout his record. You can reread it. It is every statement is I have no recollection, no recollection. The questions that were called unequivocal actually start with do you recall, or I understand you don't recall, but. These are not unequivocal responses. Furthermore, he was not asked about a single strategy he had. He actually had, he was only asked if he didn't have a strategy as to this. So the appellate division, which has unique fact-finding ability, reviewed this entire record and said, although it's an implicit finding, it's not explicit in the record, it said this is not credible testimony. And consequently found he received effective assistance, because once you get past that first step, then it's simply applying Harrington v. Richter. And you look for any plausible justification for his actions, of which we identify potentially as many as 10 different plausible justifications in our brief. Now, as for the actual innocence claim, to respond to the second aspect of your question, it's actually quite important to look at it from the perspective of what the district court was saying. What the district court was saying, and I understand why it came to the conclusion it did, was an actual innocence hearing at which a mistake was made. And I freely admit the mistake was made by the parties, which is no one brought the notation that said, semen, also blood, which is on the single page where it actually pops and says positive result to the attention of either expert. No one brought that to their attention. And yes, it is a mistake, but it's a rather substantial mistake, because if you take that notation and then read Dr. Wiener's testimony, they match perfectly, because he says, and I quote, well, I can't quote, I paraphrase, this is probably semen together with blood. That's his trial testimony, which means he was saying it is a mixed sample. Dr. Shaler came forward, that note was not brought to his attention. Based on his cold reading of a 37-year-old record, he said, I don't believe he meant that there was any blood mixed into this. But if there was, and this is their expert, he said, I would not be able to determine whether or not he is excluded or not. I see that my time is up. I will . . . But you could finish the thought. But based on that, simply, it does not exonerate the defendant. The actual correct answer, and the only answer on this 37-year-old record, is that it is an inconclusive finding. The question I have is where we started, is if there was blood testing of Defendant Bryant at the time, isn't it possible that would have been exclusionary? That's all I'm asking. We can't actually answer that question because all of the materials that we would need to actually test it, which is the appropriate way to bring this claim, have been lost because of the extraordinary delay of bringing an innocence claim. All right, fair enough. Thank you. We'll hear on behalf of Mr. Bryant. Good morning. Paul Castellaro. One, I just would like to answer a couple of things . . . Go ahead. . . . that were stated. For one, Strickland itself, I don't have the site, but it's there and I could provide it to the courts. Strickland is fully retroactive. It talks about how it applies to habeas collateral proceedings, state new trial proceedings, stuff on appeal. It very specifically applies to federal habeas collateral proceedings. With respect to the statement that the appellate division found that Mr. Arbeck was not credible, they didn't find that Mr. Arbeck was not credible. In fact, I suggest that they, in fact, found that he was credible in that they made a finding and said that he didn't consult the serologist and he didn't test David Bryant, which were facts, which he said. He also indicated very clearly, as the record will indicate in this case, that Mr. Arbeck asked no questions along . . . he didn't know basic blood types. He didn't ask one question about secretive status. He didn't ask one question about non-secretive status. He didn't ask anything that would elicit the information necessary. Okay, but counsel says that the case didn't depend on the blood stain evidence, that it's . . . Well, the point is that the blood stain evidence was completely exculpatory of David Bryant, but it was completely ignored. Yes, they had a confession and the case was based on a confession, but the blood evidence would have proved, in fact, that that confession was false. Do we know that? Pardon? Do we know that? Well, we . . . What evidence was exculpatory? Well, we know that was never even brought out at this trial. We know on its face there's a twenty percent chance, twenty percent chance, that David Bryant was excluded, period, because they never tested to determine the secretive status of the victim. So when . . . They knew it was O. They didn't know whether it was blood and or semen for certain. They didn't know, or it's also possible that she could have been a secretor, but highly unlikely. Stay with me now. Stay with me now for a minute here, all right? So what they knew was they knew the blood type of what was on her underwear, right? Correct. Correct. They knew that there was at least one head of a sperm found in her underwear. It's bizarre. I mean, I was a criminal law practitioner at this time, and I find it odd. I've never . . . I never heard a report where they found one head of a sperm in the victim's underwear. But in any event, they didn't know if she was a secretor of antigens. They didn't know it, and his lawyer knew nothing about his blood type. I mean, so the jury was told that there was O blood. Was that produced for the jury? Yes. The jury was told it was O. And he never, ever sought to introduce to the jury that his client was B? Correct. Because he didn't test him. Because he didn't test him. So it doesn't matter . . . And so Wiener says, I don't know. I can't tell for certain. It's inconclusive. But Wiener couldn't say, I'm sure that his blood is . . . that the perpetrator of the crime's blood or semen are not on her underwear. Correct. So the jury would have been extraordinarily interested in knowing that Bryant was a B blood type. Correct. And all his lawyer had to do was introduce that. He didn't have to prove that his client . . . or that someone else had done the crime. All he had to do was prove that what was in her underwear was completely inconsistent with what he could have put there. Isn't that the case? That is absolutely the case. The respondent's been arguing also that, well, that this determination of O blood found in the testing of it possibly had a mixture of blood and semen. And if you read . . . That's where the experts are arguing about that. But . . . That's where the state court judge ultimately said, all right, nobody can tell me with scientific certainty what was on her underwear. This is what Wiener said at trial. And I think it's really important. The item is obviously stained with . . . referring to the panties. The item is obviously stained with blood. I didn't make any tests along that line. I was looking particularly for semen stains. In looking for semen stains, he explained, we do it visually. We have to have something that looks like something. If visually we don't see anything that looks like anything, no tests are done. So he . . . it has been . . . because the panties had blood on them, obviously, because this was a brutal crime. But when Wiener looked at it, he was looking specifically only for a semen stain. I maintain that, in fact, that semen stain was what he found and what was tested and what was determined only to have blood group . . . We'll never know for certain what Wiener . . . We may not know for certain, but the other thing he says in his testimony, Wiener says, he also says that when you stain, a blood stain, a blood cell stains differently than the stain for semen. Didn't he talk about how the cells break down and stuff? Correct. Let me ask you this. I mean, I certainly agree that the jury could have come to a different conclusion if it had been presented with some of this blood evidence that we don't see. But, I don't know that that goes to actual innocence. And what about some of the other evidence is pretty compelling here, evidence of guilt. Including the confession. I'm sorry? Confession. Some of the other evidence that's pointed out in the red brief. So, how do you respond to that? Well, I respond to it that, you know, in 1976, we didn't know a whole bunch about false confessions. And, we attempted in the state court to introduce some evidence about what we now know about false confessions. And, we all know that now that, you know, time is a big factor. The intelligence of the person that is being interrogated. The constant denial of his denials by the police. And, I think we laid it out pretty thoroughly in the brief. The extent to which he was questioned by the various officers. And, each and every time he was told he was, you know, they didn't believe him. No, he was wrong. And, they kept up the questioning. Kept up the questioning. We attempted to introduce evidence to show that, in fact, those factors, that kind of scenario, that kind of interrogation. It's not just the confession. There's witness testimony. But, there's also . . . Clothing. He had been there before. He knew the spot. The clothing? The things he said to his girlfriend. Well, I'll answer them, if I can, in order, if I can. With respect to the clothing, this is a bloody murder scene. In fact, the prosecutor argued in the summation about the fingerprints on the . . . There wasn't a complete fingerprint on the wall. That's how bloody it was. There was blood all over the place. On David Bryant's clothing, there's not one speck of blood. Not one speck of blood. Nothing. Well, I understand that. But, the question is whether he changed his clothing. Yeah, but the question, you know, at trial, he's asked, when they come to his house, he's asked to, you know, put the clothing on that you were wearing yesterday. And, he puts that clothing on. Every witness that described the clothing that they saw David Bryant wearing that day, confirms the exact same clothing that, in fact, he put on and wore. Which they took into evidence, and they tested. Dr. Wiener tested this cloth to determine whether there was any blood or semen on it. And, each and every test indicated there was nothing there. So, quite obviously, the police, during the prosecution of this case, believed, in fact, that the clothing that David Bryant put on when they came to his house, unannounced, at 8 o'clock in the morning, and took him down to the police station, that, in fact, the clothing that he put on was the clothing he wore the day before. With respect to, there was a girlfriend that said something that he might have done something to a girl. And, one of them was when a phone call, and the father testified that, in fact, the phone never rang that morning, that the call couldn't have happened. Everyone didn't have a cell phone in those days. Right. Nobody had a cell phone. And, so, but the phone, the father said he had the phone. The phone was in the bedroom. And, in fact, there was no call that morning. With respect to the other girl that came in, she indicated that she just told about this the week before. The Billy Tyler affidavit is really significant to this, because there was a lot of police pressure. The Billy Tyler affidavit indicates that he was put under a lot of pressure. And I suggest to you that, in fact, that affidavit, because there was never any testimony on it, the court refused to put in any testimony on it, or allow us to put in testimony, but that affidavit indicates that he was put under lots of pressure to place David Bryant next to this girl, and he was the last person known to have seen her alive. The state, they poo-poo it and say it doesn't really mean anything. It wasn't that significant. It was very significant. He was the one person that put David Bryant and this victim together.  And he testified at the trial. He said he was forced under great pressure to implicate David Bryant. He came forward on his own. He read about it in the paper when David Bryant was freed. Nobody went to him. Nobody talked to him. Nobody solicited him. Nobody did anything for him. He came forward and said he had been tortured by this, and indicated that the reason he never came forward before was because he believed that, in fact, David Bryant had died in prison. My time has expired. Thank you. Counsel, you have three minutes for rebuttal. Yes, Your Honor. Thank you. Very briefly, first to clarify something regarding secretor status, 80% of the population are secretors. Consequently, even if not tested, there's an 80% chance that the victim was a secretor. The real question goes to absence of notations. That's what this entire case boils down to, the absence of notations in the lab report.  and the conflict with Dr. Sample's testimony. The absence of notations. The fact that things weren't written down. That's what this entire case comes down to. And it's 37 years ago, from the time of the hearing, that those notations were taken. This goes directly to McQuiggan v. Perkins. In the fact that they didn't note that they were a secretor? No, no. In the fact that they did not note whether or not there was bacteria, which would have explained the acid phosphatase, and they didn't note what cells necessarily were found within the sample. Instead, he simply said, detritus, which could mean broken down cells. In other words, all of the questions are answered with, unfortunately, the answer is, we don't know. And we don't know because he sat on his hands for 37 years. And the Supreme Court has said... He's got an IQ of 70. He does not, Your Honor. We have a state court opinion, specifically at the hearing, saying he's a manipulator, that it's watched him, and he does not have that IQ. That's the only statement in the record. We have, talking of Billy Tyler, we have Billy Tyler's testimony saying, I was with my mother every time that I spoke with the police. Well, 37 years ago, he files that recantation. 35 years ago, 30 years ago, 25 years ago, we talked to his mother. Well, how is it possible? Were you letting him talk to the police without you present? Okay, so the question I have, finally, it comes down to,  I concede both sides have made a case. But would a reasonable juror, at the time, have had doubt about the guilt of David Bryan, presented with all this evidence that we're talking about now? And I conclude it's likely that a reasonable juror would have had doubt. And, Your Honor, we disagree, but we disagree because there's one piece of evidence that hasn't been focused on enough, which is David Bryan's own trial testimony. The fact is, everyone keeps pointing to his confession. But his confession wasn't the basis of the jury going, and you're guilty. David Bryan took the stand, and he lied. And he lied, and he lied, and he had to admit to lying on cross-examination and admit to creating an alibi, attempting to. He had to admit to lying to Department of Corrections. He had to pretend that everyone else was a liar. He actually said that in no uncertain terms. He said four civilian witnesses fabricated evidence against him. The two who heard his admissions, they did something to a girl. He didn't speak to them, according to him. Then you have the man who saw him with the knife, the father. By the way, all these people are friends of his. One has a child in common with him. One is his then-girlfriend. These are people testifying against him. You have five police officers, all of whom would have to be liars to credit him. The jury only asked to re-hear his testimony. I see my time is up, and I need to briefly finish. The jury only asked to re-hear his testimony, and it was his testimony combined with all of his admissions. And if you read them one after another, and I'd ask that you do, you'll see how his statements kept changing. I'm not talking about the confession. Take it away for just a moment. And you'll see how all of a sudden his alibi that he initially started with suddenly changes when you get to the trial because the people he sought out to help him to make up the alibi refused to and instead testified against him for trying. You'll see this pattern, and the jury saw this pattern. The fact is David Bryant was a liar and a manipulator. And I say that, and I can say it, because the appellate division unanimously said that, even the dissent, as well as the judge who saw the proceedings, and ultimately the jury came to the same conclusion. And there's been no response by either the district court or his attorneys explaining how his testimony is not the basis of his substantive guilt. And on that basis, I do not believe that serology evidence would have had that impact. Thank you. Thank you both very much.